Laramore, Judge,
delivered the opinion of the court:
Plaintiff, a Reserve officer, while on a 15-day active duty tour, suffered a myocardial infarction, anteroseptal, due to arteriosclerotic coronary thrombosis, following an inoculation for influenza. His claim is that he is entitled to physical disability retirement on the ground that he sustained an “injury” while on active duty, under section 402 of the Career Compensation Act of 1949, 63 Stat. 802, 816.
Section 402 of the Career Compensation Act of 1949, supra, provides in pertinent part:
Sec. 402. (a) Upon a determination by the Secretary concerned (1) that a member of a Regular component of the uniformed services entitled to receive basic pay, or a member of a Reserve component of the uniformed services entitled to receive basic pay who has been called or ordered to extended active duty for a period in excess of thirty days, is unfit to perform the duties of his office, rank, grade, or rating, by reason of physical disability incurred while entitled to receive basic pay; * * * (5) that accepted medical principles indicate that such disability may be of a permanent nature, the name of such member shall be placed upon the temporary disability retired list of his service by the Secretary concerned and such member shall be entitled to receive disability retirement pay as prescribed in subsection (d) of this section: * * *
* # * * *
(c) Upon a determination by the Secretary concerned (1) that a member of the uniformed services, other than those members covered in subsections (a) and (b) of this section, is unfit to perform the duties of his office, rank, grade, or rating by reason of physical disability resulting from an injury; * * :|! (5) that accepted medical principles indicate that such disability may be of a *162 permanent nature, the name of such member shall be placed upon the temporary disability retired list of his service by the Secretary concerned and such member shall be entitled to receive disability retirement pay as prescribed in subsection (d) of this section: * * *.
Thus, beyond question, if plaintiff’s disability resulted from disease rather than injury, he would not be entitled to the relief prayed for. On the other hand, if plaintiff suffered a permanent injury while on this short tour of active duty, he would be entitled to disability retirement pay as provided for by statute.
Since this court has previously determined that myocardial infarction is not in itself an injury within the purview of section 402(c), supra,[1] the plaintiff of necessity must predicate his claim of injury as being a direct result of his influenza inoculation or the inoculation itself. We are, therefore, called upon to determine one paramount question; i.e., did plaintiff suffer an injury within the meaning of the Career Compensation Act, supra. If the answer to this question is in the affirmative, it follows that the actions of the administrative boards which denied plaintiff relief were unlawful.
The facts briefly are as follows: Plaintiff, a Reserve officer of the U.S. Air Force, was ordered to active duty for 15 days, effective J anuary 11,1953.
In compliance with those orders, plaintiff proceeded from his residence in Massachusetts to Washington, D.C. In transferring trains in New York he was obliged to carry his luggage which subjected him to considerable physical exertion. He arrived in Washington in the afternoon of January 11 and obtained quarters at the Army & Navy Club. On January 12, he proceeded to Bolling Air Force Base, registered in accordance with his orders, and from there went to the Pentagon Building, arriving in the early afternoon.
In compliance with orders, at about 4:0'0 p.m., J anuary 12, he submitted to an inoculation for influenza and immediately experienced a severe numbing in the area of the injection. Within half an hour his entire upper left arm and elbow *163 were intensely painful. In the early hours of January 18, plaintiff was awakened with severe pain in his left arm and shoulder. At this time the site of the injection was substantially swollen, reddened, and quite warm. Thereafter the pain became worse, and eventually he was taken to "Walter Reed Army Hospital. His condition was there diagnosed as myocardial infarction. After hospitalization and convalescent leave, plaintiff was finally released from the hospital.
By Special Orders dated January 21,1953, a Line of Duty Investigation was conducted concerning plaintiff’s condition and a written summary of investigation, dated February 26, 1953, was submitted by the investigating officer containing the following conclusions:
a. Colonel Rae was in a duty status under competent orders when first evidence of illness occurred.
b. There is no evidence of a previous heart condition or knowledge of such a condition by Colonel Rae.
c. There was no misconduct, influence of intoxicants, or influence of drugs in the illness suffered by Colonel Rae.
d. The physical exertions incident to active duty travel and the influenza inoculation may or may not have influenced or accelerated Colonel Rae’s illness but will be a matter for a physical evaluation board to determine. Such determination is not considered necessary in ascertaining status of line of duty illness.
On July 9, 1953, a Medical Board, convened at Walter Reed Hospital, diagnosed plaintiff’s condition as:
1. Arteriosclerotic heart disease, moderate; unchanged ; cardiac functional capacity, Class III. LOD: Yes.
2. Infarction of myocardium, anteroseptal, due to arteriosclerotic coronary thrombosis; improved. LOD: Yes.
Its recommendation was that plaintiff appear before a physical evaluation board. Subsequently, an Air Force Physical Evaluation Board was duly convened on July 17,1953 to consider plaintiff’s case. Plaintiff appeared in person and by counsel. The board had before it and considered plaintiff’s medical file, the medical board proceedings, and the clinical *164 abstract of Walter Beed Hospital. The board also heard testimony of two medical witnesses, Major Elmer F. Gillespie and Joseph M. Barker, M.D.[2]
On July 17, 1953, the Air Force Physical Evaluation Board found that plaintiff was unfit for military duty, that the diagnosis was “Myocardium, infarction of, anteroseptal, due to thrombosis, moderate,” that his disability was permanent, and that the percentage of disability was 60 percent under the appropriate Veterans Administration diagnostic code number.
In the appropriate place on the printed form used in part for its findings, the board inserted “Yes” under the printed heading “Proximate Besult of Active or Inactive Duty Training.” This answer was explained by the board in its summary of facts, as follows:
Proximal result is recommended as “Yes” since approved Line of Duty Board, Exhibit “K” found “Yes” during the present period of national emergency and evaluee has had less than eight years active duty.
The board also found that plaintiff “incurred a disability as the result of a ‘disease’ as distinguished from an ‘injury’ while on active duty for a period of less than 30 days, and is therefore not entitled to separation or retirement pay under Public Law 351.”
On July 20, 1953, plaintiff submitted a written rebuttal wherein he reviewed the medical evidence and presented his legal position with respect to what constitutes an “injury.”
On July 26, 1953, plaintiff was relieved from active duty without retirement benefits.
On August 7, 1953, the Air Force Physical Beview Council made the same findings as the Physical Evaluation Board except that no direct statement was made concerning the plaintiff’s myocardial infarction and concluded that he did not qualify for retirement.
The Air Force Disability Beview Board considered the argument of counsel, the medical history, the previous proceedings and the testimony of one Doctor Prandoni. This board determined that the injection should not be considered an injury within the purview of section 402(c), supra, and *165 further indicated that the evidence did not indicate that the inoculation caused or hastened the development of the coronary occlusion, and finally concluded that plaintiff’s disability was not the result of an injury.
Plaintiff then applied to the Air Force Board for Correction of Military Becords for a correction of his record to show disability retirement. The board examined the entire record and decided, on March 26, 1956, that no corrective action was indicated in plaintiff’s case.
This suit resulted, and at the trial before the commissioner further testimony was adduced, which testimony will be alluded to later in this opinion.
From all the evidence introduced at the trial, the commissioner of this court made the following finding:
26. From all of the evidence in this case, it cannot be found that the adverse administrative decisions with respect to the cause of plaintiff’s coronary thrombosis and myocardial infarction were arbitrary or not supported by substantial evidence.
Plaintiff has naturally excepted to this finding, and the question of the propriety thereof is entirely dispositive of this case inasmuch as the burden is upon plaintiff to show that the actions of the various administrative agencies were contrary to law, arbitrary, or capricious, or not supported by substantial evidence.
That plaintiff suffered a myocardial infarction is admitted. However, the question of whether plaintiff’s myocardial infarction in this instance resulted from injury or disease is indeed difficult for a layman to answer. In fact, judging from the testimony of the various medical witnesses, the ascertainment is also difficult for doctors trained in that field. For instance, Major Gillespie, a graduate of Georgetown University Medical School, a resident in internal medicine at Walter Reed Hospital, who had been a member of the medical board, being questioned as to whether plaintiff’s disability was a disease or an injury, replied that “* * * It could possibly be applied to both.” Major Gillespie also testified with reference to the carrying of 60 pounds of luggage by plaintiff the day before his “flu shot” that “strenuous activity can precipitate an episode of myocardial infarction.” *166 He further stated “whether or not this activity was the precipitating cause in the patient’s case I don’t think could be positively ascertained.” He conceded, on the other hand, that it could not be positively stated as a medical proposition that it could not have been the precipitating cause.
Doctor Barker, Associate Professor of Clinical Medicine at Georgetown University Medical School, Director of the Heart Station of its hospital, Chief of Cardiology, Providence Hospital, consulting cardiologist at Arlington Hospital, author of “Unipolar Electrocardiogram,” and who had examined plaintiff on July 13, 1953, testified “One cannot say with absolute certainty as to whether this injection was a precipitating factor or not.”
Doctor Prandoni, a consultant in peripheral vascular disease at Walter Reed Hospital, who examined plaintiff, testified that plaintiff’s influenza inoculation “certainly has to be considered as a probable cause of his myocardial infarction.” Doctor Prandoni declined to draw a line between injury and disease, stating that plaintiff’s symptoms on January 12 and 13, 1953 were consistent with either a flu reaction or myocardial infarction, and also that many people have died of myocardial infarction while in bed without previous stress.
Doctor Samuel A. Levine, considered in the medical profession to be an eminent cardiologist, testified that he was fairly sure that plaintiff had had some arteriosclerosis of the coronary arteries prior to his attack on January 13, 1953. Doctor Levine’s opinion was that the vaccine injection was the “probable precipitating cause” of plaintiff’s coronary thrombosis and resulting myocardial infarction. He considered three possibilities concerning causation: (1) That plaintiff’s coronary attack occurred when it was due, irrespective of and unrelated to anything that he had done or any preceding events; (2) that the carrying of the heavy luggage precipitated the attack, there being no immediate ill effects nor symptoms from that effort; and (3) that the attack was precipitated by the vaccine. He dismissed the first possibility because of the intimacy of time relationship between the injection and the attack, and also the second one (considered by him to be a possible cause, not as likely as the injection) because the effort of carrying the luggage would have been *167 expected, though, not necessarily, to produce distress while the act was being done. In relying on proximity between the injection and the attack, he stated that the explanations afforded for coronary thrombosis are “numerous and involved, vague * * * very hard to pinpoint,” that often a coronary attack occurs when the patient is asleep, due to slowing of circulation in a vulnerable artery, but there are occasions when something precipitates an attack, such as violent exercise, or infection producing swelling in the vulnerable artery. He stated that injection of influenza vaccine did not cause infection, but rather a reaction, and that as a result of the injection, plaintiff “could very well have had * * * something occur in the heart of a nondescript nature that we cannot explain exactly.” He further explained his opinion concerning plaintiff’s reaction to the injection as follows: “He reacted to something. I think it was either the exercise, the effort the day before, or the jab the next day, and I think it is more likely that it followed the jab.” Doctor Levine further stated that while he was not certain, thought something in the vaccine caused plaintiff’s coronary thrombosis.
Dr. (Captain) John F. Cline, Chief of the Allergy and Immunization Section, U.S. Air Force Hospital, Andrews Air Force Base, testified as a witness for defendant in this case. He was a 1954 graduate of New York Medical College, interned for one year, served one year in the Air Force as a general medical officer, and then was transferred to Walter Reed General Hospital where he served three years in training in internal medicine and one year in training in allergy and applied immunology. He has participated actively in the immunization of many thousands of patients, and has written and published articles in the field of clinical allergy. In his experience and reading of medical literature, he has never heard of a coronary occlusion and myocardial infarction occurring after an influenza vaccination in a person who was not sensitive to eggs.
Dr. Cline testified that influenza vaccine is a suspension of inactivated or killed influenza viral organisms, prepared by culturing certain parts of the chick embryo, with the culture killed by use of various chemical agents, usually formalin. After appropriate purification, and addition of Merthiolate *168 as a preservative, the vaccine is expanded and placed in sterile vials. This vaccine is sometimes referred to as egg yolk vaccine, but is more appropriately defined as egg protein influenza vaccine. Egg protein is also used in the preparation of vaccine for yellow fever, typhus, Rocky Mountain spotted fever, and mumps.
Dr. Cline’s opinion was that plaintiff’s reaction to the influenza vaccine injection was the typical and usual one experienced by most patients. In this connection, he considered plaintiff’s symptoms following the injection, the lack of evidence in plaintiff’s medical records of any substantial reaction to previous immunizations, the testimony of plaintiff that he had not experienced egg sensitivity, the fact that normal influenza vaccine contains no live virus, and also that plaintiff experienced no influenza infection because his temperature on admission to Walter Reed Hospital was normal at 98.6 degrees with only a low grade fever thereafter, typical of myocardial infarction. Dr. Cline’s opinion was that plaintiff had a local reaction from the influenza vaccine injection, and that he could not be sure that he had a generalized or systemic reaction.
Dr. (Colonel) Herbert W. Coone is a graduate of Harvard Medical School, with residency in internal medicine at Letterman General Hospital, practice in internal medicine since 1938, and currently assigned as consultant in internal medicine to the Air Force Surgeon General, conducting research as to the conditions which bring about heart disease in its many forms. He was called as a witness in behalf of defendant, and based his testimony on plaintiff’s medical records and other documents in evidence, without examination of plaintiff.
Dr. Coone’s opinion was that plaintiff suffered an influenza vaccine reaction of a systemic nature, manifested locally by heat, tenderness, pain and swelling, but that the obscurity of events following the injection made it difficult to appraise the extent of the reaction. He stated that typical of myocardial infarction, plaintiff first showed an elevation of temperature on the third day of hospitalization. He discussed the three possible causes of plaintiff’s coronary thrombosis and myocardial infarction, considered by Dr. Levine. His *169 opinion was that one possible canse may be considered to be the normal and unpredictable progression of an underlying organic heart disorder, and stated that undoubtedly plaintiff had arteriosclerotic heart disease prior to clinical evidence of a heart attack. Dr. Coone noted that the record showed that plaintiff experienced breathlessness and fatigue in carrying his luggage on January 11, 1953, and stated that the absence of other clinical symptoms did not preclude the possibility that such physical stress may have been a precipitating factor. He stated that plaintiff’s metabolic stress in that incident could very well have exceeded the capacity of his coronary circulation.
Dr. Coone stated that there was no evidence that plaintiff suffered an infection from the vaccine, but from a medical' standpoint a systemic reaction of sufficient severity would be on general grounds an adequate basis for relating cause and effect to the ensuing myocardial infarction.
Dr. Coone’s opinion concerning causation of plaintiff’s coronary thrombosis and myocardial infarction is adequately summarized in his own words, as follows:
* * * I think from clinical tests you can say that the myocardial infarction was the normal and unpredictable progression of an underlying myocardial disease, or it may represent the additional aggravating component of strenuous exercise, over and above what Colonel Eae was accustomed to, or was due to a moderate or a severe influenza vaccination reaction, and here I find the multiple testimony, including that of the patient, difficult to weigh.
Or one final cause is that the myocardial infarction may represent the summation of all these factors.
The medical evidence above-referred to, we think, clearly establishes but one fact; i.e., that prior to January 13, 1953, plaintiff was suffering from a pre-existing cardiovascular disease. However, none of the doctors testified that the myocardial infarction positively resulted from the injection. Major Gillespie thought it could possibly be applied to both the injection and the strain of carrying his luggage. Doctor Barker could not say with absolute certainty as to whether the injection was a precipitating factor or not. Dr. Prandoni considered plaintiff’s inoculation as a probable cause. Dr. Levine thought it was either the exercise, the *170 effort tbe day before, or tbe “jab” tbe next day. However, be thought it more likely that it followed the “jab”. Further, while not certain, Hr. Levine thought something in the vaccine caused plaintiff’s thrombosis. Dr. Cline had never heard of myocardial infarction occurring after an influenza vaccination in a person who was not sensitive to eggs.[3] Dr. Coone was of the opinion that plaintiff’s infarction was the normal and unpredictable progression of an underlying myocardial disease or of an underlying organic heart disorder, and stated that undoubtedly plaintiff had arterio-sclerotic heart disease prior to clinical evidence of a heart attack.
Thus it is apparent that doctors who examined plaintiff and doctors who examined his medical records are not in agreement as to whether plaintiff’s disability stemmed from a disease or an injury. Can this court then say that the actions taken by the various administrative boards and by the Secretary were arbitrary, or capricious, or unlawful? We think not. The inoculation was performed in accordance with standard medical practices and was the normal and ordinary practice and procedure for members called to tours of duty, in connection with their medical treatment. The serum used was the normal one in use at the time. Thus we have a situation where, in view of plaintiff’s pre-existing physical condition, his coronary difficulty could have occurred without any connection with his reaction to the influenza inoculation. Whether it was or was not the direct result of the inoculation we do not positively know. To say that his condition resulted directly from the “shot” is definitely in the field of speculation. The administrative agencies thought plaintiff’s disability was the result of a pre-existing disease and there was evidence to support such a conclusion. We cannot overturn their decision merely because we might believe otherwise. It must come from the evidence in the case. Since there is no positive evidence in the record that the flu shot positively caused plaintiff’s disability, we must hold that plaintiff has failed in his burden of proof.
*171 Consequently, we hold that the actions taken by the administrative boards and by the Secretary were neither arbitrary nor capricious. In this posture, plaintiff cannot recover and his petition is dismissed.
Davis, Judge; DuRfee, Judge; Whitaker, Judge; and JoNes, Chief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Boald A. Hogenson, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff, a resident of Greenwich, Connecticut, is a colonel in the United States Air Force Beserve, having been retired under the provisions of Title III, Public Law 810, 80th Congress. He served as an Air Force officer on extended active duty from January 2, 1941, to May 23, 1946, and on various short tours of active duty from 1947 to 1953.
2. Plaintiff’s Air Force physicial examinations prior to January 12, 1953, reflected no significant disease or physical disability. An electrocardiograph test in March 1951 indicated his heart was in good condition.
3. Plaintiff was officially ordered to “active duty for fifteen (15) days training,” effective January 11, 1953. In accordance with his orders, plaintiff on that day commenced his travel by train from Wellesley Mills, Massachusetts, to Washington, D.C. In New York City, plaintiff was obliged to carry his 50 to 60 pounds of luggage in making the shuttle trip from Grand Central Station to Pennsylvania Station, which effort subjected him to considerable physical strain. He arrived in Washington, D.C., in the afternoon of that day and obtained quarters at the Army & Navy Club.
4. Pursuant to his orders, plaintiff on January 12, 1953, reported in the morning at Bolling Air Force Base, and in the early afternoon to his official assignment in the Pentagon, Directorate of Industrial Besources.
5. In compliance with official orders plaintiff submitted to an inoculation for influenza, accomplished by injection of vaccine by hypodermic needle into his upper left arm, at about 4:00 p.m., January 12, 1953, in the dispensary at the Pentagon. Immediately upon receiving the inoculation he *172 experienced a severe numbing in the area of the injection. Within half an hour his whole upper left arm and elbow were intensely painful. By 7:00 p.m., that day, the pain had subsided enough so that he had dinner, and about 9:00 p.m., retired to bed.
6. In the early morning hours of January IS, 1953, plaintiff was awakened three or four times with a severe pain in his left arm and shoulder, which he thought to be the result of the influenza vaccine injection. He remained in bed and was able to doze off to sleep again. Thereafter, about 3:30 a.m., he awoke with a more intense pain in the back, shoulder, and upper chest. At this time the site of the injection was substantially swollen, reddened and quite warm. Thereafter the pain in his arm became worse. He felt alternating hot and cold sensations, became drenched in perspiration, and was nauseated. He then called the desk clerk and requested medical assistance. Upon being advised that a doctor from Walter Eeed Hospital would not be available until later in the morning, he requested that a civilian doctor be summoned because he had extreme pain in his back and shoulders.
7. About 8:00 a.m., January 13, 1953, a civilian doctor arrived at plaintiff’s room at the Army & Navy Club, and after checking plaintiff’s chest with a stethoscope, stated that he could hear nothing wrong with his heart and that the trouble was probably the result of the flu shot.
Shortly after 8:00 a.m., a physician from Walter Eeed Hospital arrived and gave plaintiff an injection to relieve pain. Two medical corpsmen arrived within a short time and assisted plaintiff to a waiting ambulance. He experienced a cold sweat while dressing, and became slightly nauseated as he was about to enter the ambulance. On arrival at Walter Eeed Hospital at about 9:00 a.m., plaintiff was immediately placed in bed.
8. Plaintiff’s clinical abstract record at the Walter Eeed Hospital states concerning laboratory findings in part as follows:
* * * X-ray examinations, film #42299, on admission by means of portable technique demonstrated the chest to show some increase in the transverse diameter of the *173 heart. There was a suggestion of left ventricular predominance; however, the remainder of the chest was within normal limits. A repetition of the chest x-ray by standard technique showed clear lung fields. The costophrenic angles were clear, and an inferior accessory lobe was seen in the right lung base. The cardiothoracic ratio was 15/29.7. The thoracic aorta was elongated and tortuous, but the aortic knob was not remarkably prominent. Electrocardiograms, #24365, taken on admission showed abnormal S-T segments in leads I, II, and a YE and the lateral precordial leads. The following day there were definite T-wave changes in the right precordial leads compatible with myocardial ischemia. By 16 January 1953 slight depression of S-T segments in leads I and aVL had a curve. The T-wave changes in the precordial leads were more marked, and Q-S patterns were present in Vi and V2. The records were compatible with an anteroseptal myocardial infarction. Electrocardiograms thereafter showed a progression of these changes, and the last tracing dated 3 July 1953 showed no significant change when compared to the tracing dated 12 May 1953. The present record [July 9,1953] was essentially normal, although small Q waves were present in leads II, III, and aVF.
Concerning plaintiff’s course in the hospital, the clinical abstract record stated as follows:
Course in the Hospital: The patient’s initial hospital course consisted of observation, and by the third hospital day electrocardiographic changes, white count and sedimentation rate elevation, and low grade fever supported an impression of anteroseptal myocardial infarction. He was then started on anticoagulant therapy and was continued on this regimen plus other supportive measures and complete bed rest until about 4 March 1953, when gradual ambulation was started. Ambulation progressed slowly without the development of any complications, and toward the end of March the anticoagulant therapy was discontinued. On 2 April 1953 the patient left the hospital for a month’s convalescent leave. He returned on 11 May 1953, at which time repeat studies showed no activity of his recent process, and it was felt that he could be granted another period of convalescent leave, during which time he was instructed to gradually increase his activities. This he did and returned from leave on 29 June 1953. Again a repetition of studies did not show any activity of his *174 recent cardiac process. Minimal angina has been present, however. It is the opinion of the Chief of General Medical Section #1 that maximum benefits of hospitalization have now been obtained and, because of the myocardial infarction and subsequent mild, angina pec-toris, it is felt that this patient is not qualified for full military duty. Appearance before an Air Force Physical Evaluation Board is recommended.
9. By special orders of the Air Force, dated January 21, 1953, a Line of Duty Investigation was conducted concerning plaintiff’s condition, and a written summary of investigation, dated February 26, 1953, was submitted by the investigating officer, containing the following conclusions:
a. Colonel Rae was in a duty status under competent orders when first evidence of illness occurred.
b. There is no evidence of a previous heart condition or knowledge of such a condition by Colonel Rae.
c. There was no misconduct, influence of intoxicants, or influence of drugs in the illness suffered by Colonel Rae.
d. The physical exertions incident to active duty travel and the influenza inoculation may or may not have influenced or accelerated Colonel Rae’s illness but will be a matter for a physical evaluation board to determine. Such determination is not considered necessary in ascertaining status of line of duty illness.
10. On July 9, 1953, a Medical Board convened at Walter Reed Hospital. After considering the available medical records of plaintiff’s condition, its diagnosis was:
1. Arteriosclerotic heart disease, moderate; unchanged; cardiac functional capacity, Class III. LOD: Yes.
2. Infarction of myocardium, anteroseptal, due to arte-riosclerotic coronary thrombosis; improved. LOD: Yes.
Its recommendation was that plaintiff appear before a physical evaluation board.
11. An Air Force Physical Evaluation Board was duly convened on July 17, 1953, at Walter Reed Hospital to consider plaintiff’s case, with plaintiff appearing in person and by counsel. The board had before it and considered plaintiff’s medical 201 file, the Medical Board proceedings, and the clinical abstract of Walter Reed Hospital. The board *175 also heard the testimony of two medical witnesses, Major Elmer F. Gillespie, U.S.A.F. (M.C.) and Joseph M. Barker, M.D.
12. Major Gillespie, graduate of Georgetown University Medical School in 1949, rotating internship at Providence Hospital, Washington, D.C., 1949-1950, current assignment, resident in internal medicine, Walter Reed Hospital, who had been a member of the above-mentioned Medical Board, testified as to the nature and course of the myocardial infarction suffered by plaintiff, stating that in his opinion the infarction occurred on January 12 or 13, 1953. He discussed the pathology of cases of a similar type, as follows:
witness: The pathology involved in arteriosclerotic heart disease refers to a hardening of the arteries which nourish the heart itself and the deposition of small plaques on the lining or the inner surface of these arteries. The infarction is that which occurs when one of these arteries has been occluded so that no blood can pass through it to nourish the part of the heart that is supplied by that blood vessel. Necrosis or death of the heart muscles supplied by that given vessel occurs when its blood supply is shut off.
He further stated that in his opinion, plaintiff had an antero-septal infarction, which he defined as meaning “that the septum dividing the heart into right and left chambers and the front or anterior portion of the heart was deprived of its blood supply.”
Being questioned as to whether plaintiff’s disability was a disease or an injury, Major Gillespie replied that “it could probably be applied to both,” that the immunization injection “would be the equivalent of setting up infection within his body,” and that it was “well documented that infection can precipitate myocardial infarction in cases where coronary arteriosclerosis is pre-existent.” Concerning any other evidence of any trauma which could have been a causative factor in the onset, Major Gillespie testified that the “only other trauma, and this is more conjecture than direct evidence, is that of the physical exertion required on Colonel Rae’s part in carrying his luggage during his trip from Boston to Washington in reporting on active duty.” Upon further *176 questioning concerning the carrying of 60 pounds of luggage as a precipitating factor in plaintiff’s heart condition, Major Gillespie stated that “strenuous activity can precipitate an episode of myocardial infarction. Whether or not this activity was the precipitating cause in the patient’s case I don’t think could be positively ascertained.” He conceded, on the other hand, that it could not be positively stated as a medical proposition that it could not have been the precipitating cause.
13. Dr. Barker, Associate Professor of Clinical Medicine at Georgetown University Medical School, Director of the Heart Station of its hospital, Chief of Cardiology, Providence Hospital, consulting cardiologist at Arlington Hospital, author of “Unipolar Electrocardiogram,” and who had examined plaintiff on July 13, 1953, was called as a witness by the plaintiff. Dr. Barker testified in part as follows:
WITNESS: My conclusions are — 1. That Colonel Rae has coronary arteriosclerotic heart disease and that he has sustained an anteroseptal infarct on or about January 13, 1953. That he has, at the present time, angina pectoris. That he has disability Class III, which according to the classification of the American Heart-Association means that he does not have to be confined to bed but his activities must necessarily be of the most sedentary type. That it is going to take a long time before he actually will be able to engage in gainful employment of any kind and that this condition is a permanent one, that is, the arteriosclerotic heart disease. And by and large is a progressive condition. Now, secondly, the question arises as to the relation of the influenza injection as to the onset of myocardial infarction. One cannot say with absolute certainty as to whether this injection was a precipitating factor or not. On the other hand, it is not an uncommon experience for cardiologists to see patients who have acquired infection or who have been injured in one way or another and then shortly thereafter develop myocardial infarct. An injection of this type of foreign substance which causes a marked reaction is certainly equivalent to a moderately severe infection and there is a rather strong probability that the injection acted as a precipitating cause of his myocardial infarct.
*177 In response to a question of counsel concerning whether what had happened to plaintiff was an “injury to his heart,” Dr. Barker replied:
wrrNESS: The term injury is a very loose one. It can apply to any destruction of body tissue, external or internal, or even mental as far as that goes. If peoples’ feelings are injured — we speak of that — so that this certainly is an injury. I might add that the insertion of a needle through the skin or an injection of a foreign protein is also an injury and any further effect that may either be direct or may precipitate other pathological processes in the body, and such is highly probable in this case, is a direct result of that injury.
Replying to counsel’s question as to whether the added burden upon the body of throwing off the results of the inoculation caused an additional strain on plaintiff’s heart, Dr. Barker stated:
witness: Tes, I would rather state it a little differently — that there was obviously, as a result of the injection, a local tissue reaction which was soon followed by a general body reaction. This does put an added strain on the heart similar to that which would be caused by any febrile illness.
14. On July 17, 1953, the Air Force Physical Evaluation Board found that plaintiff was unfit for military duty, that the diagnosis was “Myocardium, infarction of, anteroseptal, due to thrombosis, moderate,” that his disability was permanent, and that the percentage of disability was 60 percent under the appropriate Veterans Administration diagnostic code number.
In the appropriate place on the printed form used in part for its findings, the board inserted “Yes” under the printed heading “Proximate Result of Active or Inactive Duty Training.” This answer was explained by the board in its summary of facts, as follows:
Proximal result is recommended as “Yes” since approved Line of Duty Board, Exhibit “K” found “Yes” during the present period of national emergency and evaluee has had less than eight years active duty.
The board also found that plaintiff “incurred a disability as the result of a ‘disease’ as distinguished from an ‘injury’ *178 while on active duty for a period of less than 80 days, and is therefore not entitled to separation or retirement pay under Public Law 351.”
15. On July 20, 1053, plaintiff submitted a written rebuttal wherein he extensively reviewed the medical evidence and presented his legal position with respect to what constitutes an “injury.”
On July 26, 1953, plaintiff was relieved from active duty without retirement benefits.
16. On August 7, 1953, the Air Force Physical Keview Council, having considered all of the matters before the Air Force Physical Evaluation Board, made the same findings as did the latter board, except that no direct statement was made concerning the cause of plaintiff’s myocardial infarction. The statement was made that since plaintiff was physically unfit for military service by reason of physical disability not resulting from an injury, he did not qualify for any type of retirement or for disability severance pay under the provisions of section 402 (c), Title IV, Public Law 351, 81st Congress.
17. Pursuant to plaintiff’s application, the Air Force Disability Keview Board heard plaintiff’s case on February 9, 1955, the plaintiff not appearing in person but by counsel. That board had before it the previous proceedings concerning plaintiff, a summary of his medical history, and also heard the testimony of Dr. Andrew J. Prandoni, called as a witness by plaintiff.
18. Dr. Prandoni, a consultant in peripheral vascular disease at Walter Keed Hospital (where he was formerly Assistant Chief of the Cardiovascular Kenal Section), Assistant Clinical Professor at the George Washington University Medical School and Associate in Medicine at its hospital, Cardiologist at the Washington Regional Office of the Veterans Administration, and a practicing cardiologist who had examined plaintiff, testified that plaintiff had suffered a coronary thrombosis with myocardial infarction.
After explaining that a myocardial infarction results from stoppage, or thrombosis, of an artery supplying blood to a heart muscle, Dr. Prandoni stated with respect to the several ways in which a thrombosis may occur, as follows:
*179 Thrombosis of a vessel can occur as a result of gradual change in the wall of the blood vessel, either by inflammation as a result of acute flammatory process, or as a result of degenerative changes such as the accumulation of the fatty material that is seen in arteriosclerosis. It can also occur as the result of hemorrhage underneath the lining layer of the vessel wall, which is known as the intima, and as a consequence the intima bulges into the vessel and occludes the lumen, which is the inner portion of the tube. As a result of this bulging forward and damage to the intima, a clot usually accumulates on the inside of the vessel and the vessel becomes stopped up. I think that’s about as many as I can remember.
Dr. Prandoni testified that plaintiff’s influenza inoculation “certainly has to be considered as a probable cause” of his myocardial infarction, that an acute infection can precipitate such condition, that vaccinal reaction could be a stress equivalent to a moderately severe infection, that his review of plaintiff’s records caused him to feel that plaintiff’s vac-cinal reaction exceeded the normal, that there was confirmation in medical literature of cardiac injury resulting from injection of influenza vaccine, that more frequently than not a patient with myocardial infarction has some antecedent history of distress in physical activity, that plaintiff’s record showed no evidence of a pre-existing cardiovascular disease in excess of that which he could have had as normal for his age, and that the influenza inoculation rather than the carrying of the heavy luggage was the “more likely cause” because the “more proximal” event.
Dr. Prandoni declined to draw a line between injury and disease, stated that plaintiff’s symptoms on January 12 and 13, 1953, were consistent with either a flu reaction or myocardial infarction, and also that many people have died of myocardial infarction while in bed without previous stress.
19. On February 9, 1955, the Air Force Disability Eeview Board decided plaintiff’s case and recorded its decision as follows:
discussion
The question in this case is whether or not a “flu shot” was or caused an injury of such nature as to precipitate a coronary occlusion which became manifest about 8 to 10 hours later.
*180 During the afternoon of 12 January 1953, applicant was given a “flu shot.” He apparently had the usual reactions of pain or discomfort and possibly some swelling of the arm. Fever is also alleged. Symptoms were not incapacitating.
Beginning about midnight he began to have pain in the chest and arm which continued the remainder of the night. A doctor was called and he was sent to Walter Eeed Army Hospital. A coronary occlusion was suspected and later confirmed. Upon admission the physical findings were those of a coronary occlusion. The medical record no more than states that he had had a “flu shot” with no mention of unusual immediate reaction. There was no history of sensitivity to vaccines. The temperature on admission was normal and a rise due to the coronary occlusion appeared later, as might be expected.
It has been determined in this case that the “flu shot” should not be considered as an injury for the purposes of Title IV, Section 402(c) and applicant was separated from the service without retirement pay benefits.
It is the opinion of the Disability Eeview Board that in this case the evidence is not such as to indicate that the “flu shot” caused or hastened the development of the coronary occlusion.
FINDINGS
After careful deliberation the Air Force Disability Eeview Board finds that the Air Force Physical Evaluation Board convened 17 July 1953 at Walter Eeed Army Hospital, should be approved.
CONCLUSIONS
That the disability of former member was not the result of an injury within the meaning of Title IV, Section 402(c) and therefore he is not entitled to be certified for retirement pay benefits.
RECOMMENDATIONS
That the Deputy Chief of Staff, Personnel, initiate appropriate administrative action and thereafter notify the applicant and his counsel of the final action of the President.
20. Having found service connection for plaintiff’s myocardial infarction, the Veterans Administration on January 11, 1954, rated plaintiff 60 percent disabled from July 27, *181 1958, and plaintiff has received compensation payments from that agency, waiving to that extent his longevity retirement pay. The rating was based on the Veterans Administration diagnostic code number for coronary artery disease.
21. Plaintiff filed an application for disability retirement with the Air Force Board for Correction of Military Records. No hearing was conducted. After considering plaintiff’s application, his official 201 file, his clinical record from the Veterans Administration, and a report from the Office of the Surgeon General, concurring in the findings of the Air Force Disability Review Board, the correction board on March 26, 1956, decided that no corrective action was indicated in plaintiff’s case.
22. Dr. Samuel A. Levine, considered in the medical profession to be an eminent cardiologist, formerly (now emeritus) Professor of Clinical Medicine at Harvard Medical School, currently, a consultant in cardiology at its Peter Bent Brigham Hospital, and a practicing cardiologist at Boston, Massachusetts, examined and advised plaintiff as a consultant on several occasions since April 1953, read plaintiff’s hospital and medical records, and was called as a witness by plaintiff in the trial of this case.
Dr. Levine described the mechanisms involved in different types of coronary thrombosis, such as clotting due to roughening of the inner lining of an artery, rupture of a cholesterol abscess, hemorrhage of a capillary in the arterial wall with resulting swelling, and spasm or constriction of the artery. He stated that he could not state which mechanism was involved in plaintiff’s coronary thrombosis, but was fairly sure that plaintiff had had some arteriosclerosis of the coronary arteries prior to his attack on January 13, 1953.
Dr. Levine’s opinion was that the vaccine injection was the “probable precipitating cause” of plaintiff’s coronary thrombosis and resulting myocardial infarction. He considered three possibilities concerning causation: (1) That plaintiff’s coronary attack occurred when it was due, irrespective of and unrelated to anything that he had done or any preceding events; (2) that the carrying of the heavy luggage precipitated the attack, there being no immediate ill effects nor symptoms from that effort; and (3) that the attack was precip *182 itated by the vaccine. He dismissed the first possibility because of the intimacy of time relationship between the injection and the attack, and also the second one (considered by him to be a possible cause, not as likely as the injection) because the effort of carrying the luggage would have been expected, though not necessarily, to produce distress while the act was being done. In relying on proximity between the injection and the attack, he stated that the explanations afforded for coronary thrombosis are “numerous and involved, vague * * * very hard to pinpoint,” that often a coronary attack occurs when the patient is asleep, due to slowing of circulation in a vulnerable artery, but there are occasions when something precipitates an attack, such as violent exercise, or infection producing swelling in the vulnerable artery. He stated that injection of influenza vaccine did not cause infection, but rather a reaction, and that as a result of the injection, plaintiff “could very well have had * * * something occur in the heart of a nondescript nature that we cannot explain exactly.” He further explained his opinion concerning plaintiff’s reaction to the injection as follows: “He reacted to something. I think it was either the exercise, the effort the day before, or the jab the next day, and I think it is more likely that it followed the jab.”
Dr. Levine related that in World War II he participated in testing some 75 to 80 young men to determine their reactions to injection of albumen, that one of them died of “some peculiar kind of heart reaction,” whereas none of the others had any significant reaction. He also testified that drugs and medications, ordinarily harmless, have precipitated coronary attacks, and related in his experience how a patient had had a coronary heart attack caused by use of adrenalin for asthma, and how two people of about a thousand patients had suffered coronary attacks as a result of intravenous injection of dye for X-ray tests of the gall bladder.
Dr. Levine testified that the protein of egg albumen or the virus of influenza infection are both possible antigens or triggers which could start a reaction in the body, and while he was not certain, thought something in the vaccine caused plaintiff’s coronary thrombosis,
*183 23. Plaintiff testified in the trial of this case, related his experiences on January 12 and 13, 1953, and further stated that he had had no prior history of asthma or other allergies, that he had experienced no sensitivity to eggs, and that in 1948 he had had all of the inoculations required for overseas duty, without any significant reaction.
24. Dr. (Captain) John F. Cline, Chief of the Allergy and Immunization Section, U.S. Air Force Hospital, Andrews Air Force Base, testified as a witness for defendant in this case. He was a 1954 graduate of New York Medical College, interned for one year, served one year in the Air Force as a general medical officer, and then was transferred to Walter Beed General Hospital where he served three years in training in internal medicine and one year in training in allergy and applied immunology. He has participated actively in the immunization of many thousands of patients, and has written and published articles in the field of clinical allergy. In his experience and reading of medical literature, he has never heard of a coronary occlusion and myocardial infarction occurring after an influenza vaccination in a person who was not sensitive to eggs.
Dr. Cline testified that influenza vaccine is a suspension of inactivated or killed influenza viral organisms, prepared by culturing certain parts of the chick embryo, with the culture killed by use of various chemical agents, usually formalin. After appropriate purification, and addition of Merthiolate as a preservative, the vaccine is expanded and placed in sterile vials. This vaccine is sometimes referred to as egg yolk vaccine, but is more appropriately defined as egg protein influenza vaccine. Egg protein is also used in the preparation of vaccine for yellow fever, typhus, Kocky Mountain spotted fever, and mumps.
Dr. Cline’s opinion was that plaintiff’s reaction to the influenza vaccine injection was the typical and usual one experienced by most patients. In this connection, he considered plaintiff’s symptoms following the injection, the lack of evidence in plaintiff’s medical records of any substantial reaction to previous immunizations, the testimony of plaintiff that he had not experienced egg sensitivity, the *184 fact that normal influenza vaccine contains no live virus, and also that plaintiff experienced no influenza infection because his temperature on admission to Walter Reed Hospital was normal at 98.6 degrees with only a low grade fever thereafter, typical of myocardial infarction. Dr. Cline’s opinion was that plaintiff had a local reaction from the influenza vaccine injection, and that he could not be sure that he had a generalized or systemic reaction.
25. Dr. (Colonel) Herbert W. Coone is a graduate of Harvard Medical School, with residency in internal medicine at Letterman General Hospital, practice in internal medicine since 1938, and currently assigned as consultant in internal medicine to the Air Force Surgeon General, conducting research as to the conditions which bring about heart disease in its many forms. He was called as a witness in behalf of defendant, and based his testimony on plaintiff’s medical records and other documents in evidence, without examination of plaintiff.
Dr. Coone’s opinion was that plaintiff suffered an influenza vaccine reaction of a systemic nature, manifested locally by heat, tenderness, pain and swelling, but that the obscurity of events following the injection made it difficult to appraise the extent of the reaction. He stated that typical of myocardial infarction, plaintiff first showed an elevation of temperature on the third day of hospitalization. He discussed the three possible causes of plaintiff’s coronary thrombosis and myocardial infarction, considered by Dr. Levine. His opinion was that one possible cause may be considered to be the normal and unpredictable progression of an underlying organic heart disorder, and stated that undoubtedly plaintiff had arteriosclerotic heart disease prior to clinical evidence of a heart attack. Dr. Coone noted that the record showed that plaintiff experienced breathlessness and fatigue in carrying his luggage on January 11, 1953, and stated that the absence of other clinical symptoms did not preclude the possibility that such physical stress may have been a precipitating factor. He stated that plaintiff’s metabolic stress in that incident could very well have exceeded the capacity of his coronary circulation.
*185 Dr. Coone stated that there was no evidence that plaintiff suffered an infection from the vaccine, but from a medical standpoint a systemic reaction of sufficient severity would be on general grounds an adequate basis for relating cause and effect to the ensuing myocardial infarction.
Dr. Coone’s opinion concerning causation of plaintiff’s coronary thrombosis and myocardial infarction is adequately summarized in his own words, as follows:
* * * I think from clinical tests you can say that the myocardial infarction was the normal and unpredictable progression of an underlying myocardial disease, or it may represent the additional aggravating component of strenuous exercise, over and above what Colonel Eae was accustomed to, or was due to a moderate or a severe influenza vaccination reaction, and here I find the multiple testimony, including that of the patient, difficult to weigh.
Or one final cause is that the myocardial infarction may represent the summation of all these factors.
26. From all of the evidence in this case, it cannot be found that the adverse administrative decisions with respect to the cause of plaintiff’s coronary thrombosis and myocardial infarction were arbitrary or not supported by substantial evidence.
CONCLUSION 03? LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is not entitled to recover and the petition is dismissed.

 Gwin v. United States, 133 Ct. Cl. 749.

 The testimony of these two doctors will be discussed infra.

 In this connection, the evidence establishes that plaintiff was not and had never been sensitive to eggs.